*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 23**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

KHALID MOHAMUD,
*Appellant.*

No. 20140844
Filed April 21, 2017

On Direct Appeal

Third District, West Jordan
The Honorable Terry L. Christiansen
No. 131401310

Attorneys:

Herschel Bullen, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Christopher D. Ballard, Asst. Solic. Gen.,
Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court in which
JUSTICE DURHAM and JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion, in which
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   This case, along with *State v. DeJesus*,[1] requires us to apply
the due process analysis we set forth in *State v. Tiedemann*,[2] which

---

[1] 2017 UT 22, --- P.3d ---.

[2] 2007 UT 49, ¶ 44, 162 P.3d 1106.

addresses the due process rights of criminal defendants when evidence has been lost or destroyed. Defendant Khalid Mohamud was sentenced to an indeterminate term of one to fifteen years in prison for possessing a shank in prison. He argues on appeal that a video recording of the discovery of the shank was lost or destroyed by the State and that this loss of evidence violated his due process rights and required the dismissal of the case. He also raises an ineffective assistance claim, arguing that his counsel was ineffective in stipulating to the due process analysis applicable to claims regarding evidence lost or destroyed by the State. The stipulation conceded that there is a threshold requirement that the defendant show a reasonable probability that the lost evidence would have been exculpatory. Under the due process analysis set forth in *Tiedemann*, we hold that Mr. Mohamud's due process rights were not violated and that his counsel did not render ineffective assistance. We thus affirm the trial court's decision.

**Background**

¶ 2   On August 29, 2013, Mr. Mohamud, who was incarcerated in the Utah State Prison, was scheduled to transfer to another cell to allow another inmate to move into his former cell. There were three officers involved in the transfer: Officer Miller, who was stationed in the control room that overlooked the prison section in which Mr. Mohamud was held, and Officers Auelua and Weaver, who were standing outside of the section containing Mr. Mohamud. Mr. Mohamud was instructed to leave his cell, place his possessions in front of his new cell, enter the section shower, and lock the shower door so that the new inmate could be moved into Mr. Mohamud's former cell. Mr. Mohamud placed his possessions in front of the new cell and entered the shower, but did not close or lock the door. Officer Miller, via intercom from the control room, accordingly instructed Mr. Mohamud to approach the section door.

¶ 3   After Mr. Mohamud approached the door, Officer Auelua handcuffed him and led him through the door into a "horseshoe" area. As Officer Auelua escorted Mr. Mohamud, Officer Weaver noticed "a pretty good-sized bulge" in Mr. Mohamud's left sock. Officer Weaver asked Mr. Mohamud about the bulge. When Mr. Mohamud did not respond, Officer Weaver asked him to step up against the wall. Mr. Mohamud complied, and Officer Weaver reached down into his sock and pulled out a metal shank that could have "kill[ed] somebody." Officer Auelua testified that he saw Officer Weaver remove the shank, and Officer Miller testified that although he saw Officer Weaver reach down to Mr. Mohamud's ankle, he did not personally see the shank. Officer Miller also

testified that Officer Weaver told him that Officer Weaver had found a shank in Mr. Mohamud's sock.

¶ 4 After the shank was discovered, Officers Weaver and Auelua escorted Mr. Mohamud to a holding cell. While being escorted, Mr. Mohamud asked questions like "[W]hy are you bringing me down here? What did I do?" Officer Weaver took a picture of the shank and prepared a report. Subsequently, Bryan Heyborne, an investigator for the Utah Department of Corrections, was assigned to the case. As part of his investigation, Mr. Heyborne spoke with Mr. Mohamud and, among other questions, asked him whether the shank belonged to a cellmate. Mr. Mohamud said it did not. Mr. Heyborne also reviewed Officer Weaver's report, though he did not review or otherwise seek to obtain or preserve any available surveillance footage.

¶ 5 On October 11, 2013, Mr. Mohamud was charged with one count of possessing a prohibited item in a correctional facility. On November 6, 2013, counsel for Mr. Mohamud submitted a discovery request seeking all video recordings of the event. Counsel renewed this request on January 9, 2014. Soon after, the State told defense counsel that any footage that might have captured the incident would have already been recorded over. According to Mr. Heyborne's later testimony, recordings from surveillance cameras "are saved for about approximately 30 days, and then they are recorded over." Thus, by the time charges were filed—forty-three days after the incident—any footage that might have captured the incident had already been lost. In response to this information, Mr. Mohamud moved to dismiss the charges against him, arguing that there was surveillance footage that captured the incident, that it had been lost or destroyed by the State, that there was a reasonable probability the evidence would have been exculpatory because it could have impeached the State's witnesses' credibility, and that he was prejudiced by the loss of the evidence.

¶ 6 During the hearing on Mr. Mohamud's motion to dismiss, the court asked defense counsel, "Don't you have to show on behalf of Mr. Mohamud that there is a reasonable probability that the destroyed videotape would be exculpatory?" Counsel agreed that this was the standard "as laid out in *Tiedemann*." Counsel argued that a video recording of the incident would have been exculpatory because it could have impeached the testimony of the officers, though he provided no further details as to what specific testimony would have been impeached. When questioned by the court about

the lack of details and supporting evidence, counsel for Mr. Mohamud stated that "there is no way for us to actually proffer" evidence that the lost video would have been exculpatory "aside from Mr. Mohamud's own testimony," which would require him to "waiv[e] his right against self[-]incrimination or his right to remain silent."

¶ 7 Because Mr. Mohamud chose not to testify, the only evidence put on during this hearing was testimony from Mr. Heyborne, the investigator. He testified that "most" prison facilities have surveillance cameras, that there were some cameras in the unit where Mr. Mohamud was being held, and that these cameras generally "record[] and . . . are on." Mr. Heyborne also testified that while he knows where some of the cameras are located, and that they possibly could have recorded the incident, he did not "know if those cameras were actually recording that day," he never "view[ed] any recordings for August 29th of 2013," and he "ha[d] no knowledge whether or not there was an actual recording made." Ultimately there was no testimony as to whether the cameras were on and recording, what the recording would have shown, or whether the recording would have contradicted the facts as alleged by the State.

¶ 8 At the end of the hearing, the court concluded that the lack of evidence showing a reasonable probability that the lost evidence would be exculpatory was the dispositive issue. The court held that defense counsel's statement that "he believes it is potentially exculpatory . . . doesn't meet the standard of the case law." The court also found that "there is not even evidence that there was a videotape. There may have been a videotape. There is no evidence the cameras were on or they were off at the time[,] . . . nothing to indicate what the camera . . . would have seen, if it would have even seen this incident." Accordingly, the trial court denied Mr. Mohamud's motion to dismiss.

¶ 9 A one-day jury trial was held on August 13, 2014. The jury found Mr. Mohamud guilty of one count of transportation or possession of items prohibited in correctional and mental health facilities. The court sentenced Mr. Mohamud on September 2, 2014, to an indeterminate term of one to fifteen years in prison, to run consecutively to his other sentence. He timely appealed. After he filed his opening brief, the court of appeals certified the case to us. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).

**Standard of Review**

¶ 10 There are two issues on appeal: first, whether Mr. Mohamud's trial counsel rendered ineffective assistance under *Strickland v. Washington*[3] and, second, whether Mr. Mohamud's due process rights were violated by the loss or destruction of evidence under the standard set forth in *State v. Tiedemann*.[4] As to the first issue, "'[a] claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law' that the court reviews for correctness."[5] The second issue, the due process question, is a mixed question of fact and law. We review the legal question involved—whether due process was violated—for correctness.[6] But the underlying factual determinations on which this legal question is based will not be set aside unless "clearly erroneous."[7]

**Analysis**

¶ 11 Mr. Mohamud raises two issues on appeal: first, that his trial counsel rendered ineffective assistance by stipulating to the legal test the trial court employed to determine whether Mr. Mohamud's due process rights were violated by the alleged destruction of evidence; and, second, that the court erred by not dismissing Mr. Mohamud's case because his due process rights were indeed violated by the alleged destruction of evidence. Both of these issues depend on a threshold question: What is the proper legal standard for deciding whether a due process violation occurs as a result of the destruction of evidence?

¶ 12 We first addressed this question in *State v. Tiedemann*, where we held that

---

[3] 466 U.S. 668 (1984).

[4] 2007 UT 49, 162 P.3d 1106.

[5] *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841 (citation omitted).

[6] *Tiedemann*, 2007 UT 49, ¶ 12 ("Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness.").

[7] *Id.* ("[B]ecause [the due process] question requires application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." (citation omitted)).

> In cases where a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory, we find it necessary to require consideration of the following: (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.[8]

The key issue raised by Mr. Mohamud is whether the *Tiedemann* due process analysis requires a threshold showing that there is a reasonable probability the lost or destroyed evidence would have been exculpatory. This issue is common to both this case and to another case heard and decided contemporaneously, *State v. DeJesus*.[9] Because the issue is more centrally presented in *DeJesus*, we address the applicable standard more fully therein.[10] For purposes of this case, it is sufficient to recognize that the *Tiedemann* due process analysis does require a criminal defendant to prove as a threshold matter that there is a reasonable probability that the lost or destroyed evidence would have been exculpatory, and that without such a showing, the defendant has no due process claim.

¶ 13 With this standard in mind, we turn now to Mr. Mohamud's arguments on appeal. We first address his ineffective assistance claim and hold that his counsel was not ineffective in agreeing to the correct due process standard. We then review Mr. Mohamud's claim that his due process rights were violated by the alleged loss of the surveillance recordings and conclude that they were not, because he failed to make the threshold showing under *Tiedemann* that the evidence had a reasonable probability of being exculpatory. Accordingly, we affirm the decision of the trial court.

### I. Mr. Mohamud's Counsel Was Not Ineffective

¶ 14 Mr. Mohamud contends that his trial counsel's failure to argue for an interpretation of *Tiedemann* that does not impose a threshold requirement—an interpretation different from the one we

---

[8] *State v. Tiedemann*, 2007 UT 49, ¶ 44, 162 P.3d 1106.

[9] 2017 UT 22, --- P.3d ---.

[10] *See id.* ¶¶ 21–36.

endorse above and in *State v. DeJesus*[11]—constituted ineffective assistance. A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*.[12] The test to determine if a defendant received ineffective assistance has two prongs: first, "the defendant must show that counsel's representation fell below an objective standard of reasonableness."[13] "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[14] But "so long as 'a rational basis for counsel's performance can be articulated, we will assume counsel acted competently.'"[15] And "[t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16] The second prong of the test requires the defendant to show that "any deficiencies in counsel's performance [were] prejudicial to the defense."[17] Because we find that Mr. Mohamud's counsel did not err in agreeing to the trial court's interpretation of *Tiedemann*, we hold that Mr. Mohamud's claim fails under the first prong of the *Strickland* test.

¶ 15 Mr. Mohamud's ineffective assistance claim stems from an exchange between the court and his counsel during the hearing on his motion to dismiss. The trial court asked Mr. Mohamud's counsel, "Don't you have to show on behalf of Mr. Mohamud that there is a reasonable probability that the destroyed videotape would be exculpatory?" Counsel agreed that this was the standard "as laid out in *Tiedemann*." Mr. Mohamud argues that counsel should have instead pressed for the interpretation of *Tiedemann* set forth in the court of appeals case *State v. Jackson*, which laid out a due process analysis that did not include a threshold requirement that the defendant establish a reasonable probability that the lost or

---

[11] 2017 UT 22, ¶ 29, --- P.3d ---.

[12] 466 U.S. 668 (1984).

[13] *Id.* at 688.

[14] *Id.* at 687.

[15] *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984 (citation omitted).

[16] *State v. Larrabee*, 2013 UT 70, ¶ 19, 321 P.3d 1136 (alteration in original) (citation omitted).

[17] *Strickland*, 466 U.S. at 692.

destroyed evidence would have been exculpatory.[18] In Mr. Mohamud's view, a "[f]ailure to cast the law in the light most favorable to one's client regarding potentially exculpatory evidence" constitutes ineffective assistance.

¶ 16 The problem with Mr. Mohamud's argument is it requires us to hold that counsel may be ineffective for agreeing to a reasonable (and ultimately correct) statement of the law. As we discuss in *State v. DeJesus*, *Tiedemann* clearly establishes a threshold reasonable probability requirement,[19] and we obviously cannot fault Mr. Mohamud's counsel for agreeing with us as to the proper analysis. Further, the basis for the argument Mr. Mohamud claims his counsel should have made is tenuous. Although the court of appeals' decision in *Jackson* could be read to suggest there was no threshold reasonable probability requirement—a statement at odds with our pronouncement in *Tiedemann*—the court of appeals later contradicted this interpretation in *State v. Otkovic*.[20]

¶ 17 Although counsel must provide effective representation, this does not include a requirement to make every possible objection or raise every conceivable legal argument in favor of a criminal defendant.[21] Counsel properly acts "within the wide range of

---

[18] 2010 UT App 328, ¶ 20, 243 P.3d 902. In *Jackson*, the court of appeals interpreted *Tiedemann* as holding that "courts should consider the 'nonexclusive factors' outlined in rule 16' . . . [and], [a]ldditionally, if a defendant establishes 'a reasonable probability that lost or destroyed evidence would be exculpatory,' courts also need to consider" the culpability of the State and "the degree of prejudice to the defendant." *Id.* (citation omitted). As discussed in *State v. DeJesus*, this interpretation of *Tiedemann* is erroneous, and we disavow it.

[19] 2017 UT 22, ¶¶ 24–27.

[20] 2014 UT App 58, ¶ 24, 322 P.3d 746 (holding that "to prevail on [a motion to dismiss], a defendant must first demonstrate, as a threshold matter, that there is 'a reasonable probability that lost or destroyed evidence would be exculpatory'" (quoting *Tiedemann*, 2007 UT 49, ¶ 44)).

[21] *See King*, 2010 UT App 396, ¶ 31 ("[N]either speculative claims nor counsel's failure to make futile objections establishes ineffective assistance of counsel." (quoting *State v. Chacon*, 962 P.2d 48, 51 (Utah 1998))).

reasonable professional assistance"[22] in not raising a legal argument if he or she could reasonably conclude based on existing law that raising the argument would be fruitless or ineffective strategy.[23] Thus, although Mr. Mohamud's counsel may have had some basis under *Jackson* to argue against the standard imposed by the trial court, his counsel's apparent choice to follow the plain language of *Tiedemann*—an interpretation we have reaffirmed today—and the more recently decided court of appeals case is clearly reasonable. Consequently, we hold that Mr. Mohamud's counsel's performance did not fall below an objective standard of reasonableness and thus reject Mr. Mohamud's ineffective assistance claim. We turn now to whether Mr. Mohamud's due process rights were violated by the alleged loss of relevant surveillance footage.

## II. Mr. Mohamud Has Failed to Establish a Reasonable Probability that the Lost or Destroyed Evidence Would Have Been Exculpatory

¶ 18 Mr. Mohamud argues that the trial court erred by denying his motion to dismiss based on the alleged destruction or loss of a video recording of the events leading to his conviction. We held in *Tiedemann* that, as a matter of Utah constitutional law, a defendant has a due process right to evidence that has a reasonable probability of being exculpatory.[24] Thus, the destruction or loss of such evidence violates due process. As a result, in order to establish a due process violation arising from the loss of evidence, a defendant must first demonstrate a reasonable probability that the lost evidence would have been exculpatory.[25] Once the reasonable probability threshold

---

[22] *Larrabee*, 2013 UT 70, ¶ 19 (citation omitted).

[23] *See Jameson v. Coughlin*, 22 F.3d 427, 429 (2d Cir. 1994) ("Based on the precedents . . . at the time of Jameson's appeal, it was reasonable for counsel to conclude that raising [a particular issue] would not have been effective appellate strategy. . . .

"[C]ounsel [also cannot] be deemed incompetent for failing to predict that the New York Court of Appeals would later overrule the Second Department's reasonable interpretation of New York law.").

[24] *See State v. DeJesus*, 2017 UT 22, ¶ 45, --- P.3d --- ("[O]nce 'a defendant has shown a reasonable probability that lost or destroyed evidence would be exculpatory,' the defendant has established that a due process violation occurred." (quoting *State v. Tiedemann*, 2007 UT 49, ¶ 44, 162 P.3d 1106)).

[25] *See id.; see also Tiedemann*, 2007 UT 49, ¶ 44.

has been satisfied, the second part of the *Tiedemann* analysis sets forth two factors that courts must balance both to determine the seriousness of the due process violation and to fashion the appropriate remedy: (1) the culpability of the State in the loss or destruction of the evidence and (2) the prejudice to the defendant as a result of the missing evidence.[26]

¶ 19 Applying this test to the facts of this case, we first note that Mr. Mohamud challenges the trial court's finding that "there is not even evidence that there was a videotape. . . . There is no evidence the cameras were on or they were off at the time[,] . . . nothing to indicate what the camera . . . would have seen, if it would have even seen this incident." We decline to address this challenge on appeal because even if we assume that the alleged video footage both existed and captured the incident at issue, Mr. Mohamud has still failed to show that there was a reasonable probability that it would have been exculpatory.[27] He has proffered only speculation as to what the footage might have shown. This does not rise to the level of reasonable probability. Consequently, Mr. Mohamud has not shown

---

[26] *DeJesus*, 2017 UT 22, ¶ 45; *Tiedemann*, 2007 UT 49, ¶¶ 44–45.

[27] Certainly, a necessary predicate to evaluating whether lost or destroyed evidence would have been exculpatory is to establish that the evidence actually existed. In this case, the trial court found, within the context of the motion to dismiss hearing, that Mr. Mohamud provided inadequate evidence to show that a videotape capturing the incident existed. In that hearing, he provided the testimony of the investigator, Mr. Heyborne, that most prison facilities have cameras, there were cameras in Mr. Mohamud's section, and these cameras "record[] and . . . are on." This testimony would seem insufficient to establish that a camera was in the area where Mr. Mohamud was searched and would have, if turned on, captured the incident. Accordingly, the trial court found that "there is not even evidence that there was a videotape." But during the subsequent trial, testimony established that cameras covered the "horseshoe area," where Mr. Mohamud was detained and searched. While this evidence, together with Mr. Heyborne's testimony at the hearing that cameras "record[] and . . . are on," may be sufficient to show a reasonable probability that a videotape capturing the incident existed, we do not reach this factual issue because, as noted above, even if a videotape did exist, Mr. Mohamud has not shown that there was a reasonable probability that it would have been exculpatory.

that his due process rights were violated by the loss or destruction of the video recording.

¶ 20 As discussed above and in *State v. DeJesus*, in order to establish that his due process rights were violated under *Tiedemann*, Mr. Mohamud must show that there was a reasonable probability that the evidence would have been exculpatory.[28] Although a "reasonable probability" is difficult to define, we have provided some guidelines: "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[29] It is "above [a] 'mere possibility,'" though it may fall "substantially short of the 'more probable than not'" standard.[30] As we discussed in *State v. DeJesus*, the bar is quite low and will be met so long as the defendant's proffer as to what the lost evidence would have shown is not "pure speculation or wholly incredible."[31] But even though the bar is low, there must be more than speculation, which is all that Mr. Mohamud has offered.[32]

¶ 21 The majority of Mr. Mohamud's argument as to whether or not the lost evidence would have been exculpatory is dedicated to general descriptions of the value of video evidence. As he states, "The video would have been the best evidence of what actually occurred, and, at the very least, there is a reasonable probability that the video would have contained evidence that could have been used to impeach the testimony of the correctional officers." It is certainly true that a video recording of the incident would have been highly probative of what truly happened. But simply stating that video recordings can be helpful to determine truth does not establish that this particular video recording would have been helpful to Mr. Mohamud in the specific circumstances of his case.

---

[28] *See DeJesus*, 2017 UT 22, ¶ 29.

[29] *State v. Knight*, 734 P.2d 913, 920 (Utah 1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

[30] *Id.*; *see also DeJesus*, 2017 UT 22, ¶ 39.

[31] *DeJesus*, 2017 UT 22, ¶ 39.

[32] *See id.* (noting that if the defendant's proffer of what the lost evidence would have shown and how that evidence would have benefitted the defendant "is not pure speculation or wholly incredible, the standard will be satisfied").

¶ 22 Mr. Mohamud must make some proffer as to why the video would have been relevant to his defense, which he has failed to do. Although he states that the video evidence "would have contradicted, discredited or called the correctional officers' memory into question in some way," he provides no description, testimony, or other evidence establishing what the video would have shown and how that would have impeached the officers' testimony. There is no alternative theory of where the shank came from, no suggestion that the shank was planted on Mr. Mohamud, and no description of how the video would have shown that the material aspects of the officers' testimony were mistaken or false. To establish a reasonable probability that video evidence is exculpatory for impeachment purposes, a defendant cannot rest on the claim that the evidence could have undermined confidence in a witness's testimony in some possible way, but must instead make some proffer as to what testimony would have been contradicted and how such a contradiction would have aided the defendant.[33] Mr. Mohamud's speculation that the video evidence could have impeached the officers' testimony in some unspecified way is insufficient to satisfy the reasonable probability threshold set forth in *Tiedemann* and *DeJesus*.[34]

¶ 23 We recognize that, due to the State's failure to preserve any potentially relevant footage, Mr. Mohamud is hampered in his ability to describe what it contained. This is the reason we have set a low threshold bar by requiring only a reasonable probability. Mr. Mohamud could have met his burden by offering the testimony of other inmates who witnessed the event, as in *DeJesus*.[35] He also could have testified on his own behalf as to what the video would have shown, which would not have waived his Fifth Amendment right against self-incrimination. Courts have long recognized that "upon a showing of substantial tension between a defendant's desire to testify in a hearing that adjudicates a claim of constitutional right in a criminal case and the right of that defendant not to give testimony

---

[33] *See id.* ¶¶ 39, 44 (holding that the defendant's proffer of testimony from a potentially unreliable witness and arguably contradictory testimony from a prison guard satisfied the reasonable probability standard because it supported her claim that the State had failed to prove the intent element of the crime).

[34] *See id.* ¶¶ 29, 39; *Tiedemann*, 2007 UT 49, ¶ 44.

[35] *DeJesus*, 2017 UT 22, ¶ 41.

that is incriminating as to the charge in question," defendants may offer potentially incriminating testimony without surrendering their Fifth Amendment privileges.[36] As the United States Supreme Court stated, it would be "intolerable that one constitutional right should have to be surrendered in order to assert another."[37] Thus, if no other evidence was available, Mr. Mohamud could have testified on his own behalf as to what discrepancies the video footage would have shown without fear that such testimony would later be used against him.

¶ 24 Mr. Mohamud's burden to show by reasonable probability that the lost evidence would have been exculpatory includes the duty to make some proffer as to how the surveillance footage could have potentially helped his case, even if such a showing necessitated that he personally testify in some fashion. Although the showing required of defendants is low, there must be something more than speculation about how the evidence could conceivably be exculpatory. And in this case, speculation about potential impeachment is all that has been presented. Accordingly, Mr. Mohamud has failed to show that he was denied due process under the reasonable probability standard set forth in *Tiedemann*. We therefore affirm the trial court's denial of his motion to dismiss.

**Conclusion**

¶ 25 *Tiedemann* properly requires a threshold showing by a defendant that there is a reasonable probability that any lost or destroyed evidence would have been exculpatory. We reject Mr. Mohamud's ineffective assistance claim because counsel cannot be considered ineffective for agreeing to the correct legal standard. As to his due process claim, Mr. Mohamud has failed to show that the trial court's factual determination that there was no evidence that the relevant video footage existed was clearly erroneous. Further, even assuming that footage existed, Mr. Mohamud has failed to demonstrate a reasonable probability that it would have been

---

[36] *United States v. Bryser*, 95 F.3d 182, 186 (2d Cir. 1996).

[37] *Simmons v. United States*, 390 U.S. 377, 394 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.").

A.C.J. Lee, Concurring in part and concurring in the judgment

exculpatory. Accordingly we affirm the trial court's denial of his motion to dismiss.

––––––––––––––

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring the judgment:

¶ 26 I concur in the court's analysis and judgment under the standard set forth in *State v. Tiedemann*, 2007 UT 49, ¶ 44, 162 P.3d 1106, and *State v. DeJesus*, 2017 UT 22, __ P.3d __. My only caveat, and sole reason for writing separately, is one I explained in my separate opinion in *DeJesus*—that the standard for regulating and sanctioning the State's destruction of evidence is appropriately rooted in our inherent power to regulate proceedings in our courts (as reflected in rule 16 of our criminal rules), and not the Due Process Clause of the Utah Constitution. I concur on that same basis here.

––––––––––––––